**Brad GERDES, Ronald S. Faust, Vicki L. Faust and Ronald F. Faust, Plaintiffs,**

v.

**JOHN HANCOCK MUTUAL LIFE INSURANCE COMPANY, Defendant.**

No. 99–1393.

United States District Court, C.D. Illinois.

July 27, 2001.

Robert P Follmer, Pontiac, IL, Gregg N Grimsley, Grimsley & Grimsley, Peoria, IL, Ronald K Fellheimer, John W Kauffman, Fellheimer Law Firm, Pontiac, IL, for plaintiffs.

William A Chittenden, III, Craig M Bargher, Peterson & Ross, Chicago, IL, Ross E Canterbury, Bradly M Butler, Westervelt Johnson Nicoll & Keller, Peoria, IL, for defendant.

## ORDER

MIHM, District Judge.

This matter is now before the Court on cross-motions for summary judgment. For reasons set forth herein, Plaintiffs' Motion for Summary Judgment [27–1] is DENIED, and Defendant's Motion for Summary Judgment [28–1] is GRANTED.

### Factual Background

Defendant, John Hancock Mutual Life Insurance Company ("John Hancock"), is the insurer of an Accidental Death and Dismemberment policy ("AD & D policy") issued to employees of R & R Donnelly & Son. Decedent, Brian K. Faust ("Faust"), was a participant under the AD & D policy at all relevant times, and Brad Gerdes, Ronald S. Faust, Vicki L. Faust, and Ronald F. Faust (collectively "Plaintiffs") were named beneficiaries under the AD & D policy.

On November 5, 1999, Plaintiffs filed their Complaint in the Circuit Court of the Eleventh Judicial Circuit, Livingston County, Illinois. John Hancock removed the action to this Court on December 14, 1999, pursuant to 28 U.S.C. § 1441 and 1446. The Plaintiffs seek recovery of the accidental death benefits under Section 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974 ("ERISA"). See 29 U.S.C. § 1001 et seq. Plaintiffs contend that they were improperly denied benefits under the AD & D policy.

There is no real dispute about the facts of this case. On July 12, 1999, Faust's body was discovered during the early morning hours in a park in Pontiac, Illinois. A coroner determined that the cause of death was due to opiate and cocaine intoxication. A toxicology report revealed the presence of cocaine, morphine, and ethanol. The parties have stipulated that Faust's ingestion of the drug was voluntary. The parties have also agreed that John Hancock was not aware of any direct evidence that Faust ingested the drug in an attempt to commit suicide.

Under the terms of the AD & D policy, and described in the Summary Plan Description, in the event of a participant's accidental death, the beneficiaries would receive twice the amount that would be otherwise paid under the general life insurance policy. The parties agree that the amount the Plaintiffs would be entitled to, if coverage exists, is $113,000.00.

The AD & D policy specifically provides that "no benefits will be payable for any loss caused by ... suicide while sane or insane, or intentionally inflicted injury." The Summary Plan Description also provides that benefits will not be paid under the AD & D policy if the loss is a result of "intentionally self-inflicted injuries or suicide, while sane or insane." Neither the AD & D policy nor Summary Plan Description vest the plan administrator or any third party the exclusive discretion of construing the terms or making eligibility determinations regarding the AD & D policy.

This Order follows.

### Summary Judgment

A motion for summary judgment will be granted where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The moving party has the responsibility of informing the Court of portions of the record or affidavits that demonstrate the absence of a triable issue. Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The moving party may meet its burden of

showing an absence of material facts by demonstrating "that there is an absence of evidence to support the non-moving party's case." *Id.* at 2553. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986); *Cain v. Lane,* 857 F.2d 1139, 1142 (7th Cir.1988).

If the moving party meets its burden, the non-moving party then has the burden of presenting specific facts to show that there is a genuine issue of material fact. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). Federal Rule of Civil Procedure 56(e) requires the non-moving party to go beyond the pleadings and produce evidence of a genuine issue for trial. *Celotex Corp.,* 106 S.Ct. at 2553. This Court must then determine whether there is a need for trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may be reasonably resolved in favor of either party. *Anderson,* 106 S.Ct. at 2511; *Hedberg v. Indiana Bell Tel. Co.,* 47 F.3d 928, 931 (7th Cir.1995).

### Standard of Review

The parties do not dispute that the AD & D policy issued by John Hancock does not vest the plan administrator or any other third party the discretion in construing terms or making eligibility determinations regarding the AD & D policy. Accordingly, this Court is required to review the denial of benefits *de novo. See Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989); *Santaella v. Metropolitan Life Insurance Company,* 123 F.3d 456 (7th Cir. 1997).

### Discussion

■ "Because this insurance plan was established under ERISA, federal common law rules of contract interpretation govern the disposition of this case." *Life Insurance Company of North America v. Von Valtier,* 116 F.3d 279 (7th Cir.1997). "Under those federal common law rules," courts are to "interpret the terms of the policy in an ordinary and popular sense, as would a person of average intelligence and experience," and "construe all plan ambiguities in favor of the insured." *Id.* Plain language may only be deemed ambiguous where "it is subject to more than one reasonable interpretation." *Id.*

John Hancock's Summary Plan Description expressly provides with regard to the Accidental Death and Dismemberment Insurance that:

> If an employee suffers any of the losses listed below as a result of a nonoccupational injury, the Insurance will pay the amount of insurance for the loss in the Schedule of Indemnities below ...

(Part 3, Page 1–ADD(NO)). However, the intentionally self-inflicted injury exclusion states that: "No Benefit will be payable for any loss caused by ... suicide while sane or insane, or intentionally self-inflicted injury ..." (Amendment to Group Policy No. 680–G, Part 3, Page 1–ADD(NO)). While no definitions for the words "accident," "suicide" or "intentionally self-inflicted injury" exist in the plan, this Court will assign the plain language meaning to those words. *Bevans v. Iron Workers' Tri-State Welfare,* 971 F.Supp. 357, 360 (C.D.Ill.1997).

Plaintiffs contend that *Santaella* stands for the proposition that in order for a defendant to prevail, it must show that the death was either highly likely or substantially certain to be a result of the decedent's conduct. 123 F.3d at 463. This Court disagrees. *Santaella* requires a

court to consider whether the death was a result of an "accident" *or* an "intentionally inflicted self-injury." *Id.* at 456.

*Santaella* dealt with a 36–year–old woman, Teresita Eldridge, who overdosed on propoxyphene. *Santaella*, 123 F.3d at 458. Her family filed suit against Metropolitan Life Insurance for breach of contract when the insurance company refused to pay accident insurance benefits. The court determined that Eldridge's death was an accident based on the evidence presented and that it was unnecessary to determine if she fell within the plan's exclusion section because there was no foundation in the record for that type of analysis. *Id.* at 463.

The Seventh Circuit considered a number of factors in reaching the conclusion that the decedent's overdose was an accident. First, the decedent was taking propoxyphene for a medical condition. Second, the amount of the drug in Eldridge's body at the time of death was three times less than what would normally be considered a lethal dose. Third, Eldridge's family offered no reason for her to commit suicide. Finally, the medical officer opined that Eldridge "was the type of person who would take a lethal overdose of a prescription drug in an accidental manner." *Id.* Accordingly, the Seventh Circuit concluded that Eldridge's death was accidental. *Id. Santaella* specifically states that:

> [F]or death under an accidental death policy to be deemed an accident, it must be determined (1) that the deceased had a subjective expectation of survival, and (2) that such expectation was objectively reasonable, which it is if death is not substantially certain to result from the insured's conduct.

*Id.* at 463, *citing Todd v. AIG Life Ins. Co.*, 47 F.3d 1448, 1456 (5th Cir.1995). Since the Seventh Circuit determined that Eldridge's death was an accident and that there was no evidence to support the alle-

gation that she intentionally inflicted this injury upon herself, the court did not formulate a test to determine if she intentionally inflicted self-injury.

■ On the other hand, this Court in *Bevans* established a standard to determine if an injury is the result of an intentionally self-inflicted injury. In *Bevans*, the injured party, Roger Bevans ("Roger"), who was 17, overdosed on Tylenol. *Bevans*, 971 F.Supp. at 359. On the night Roger overdosed, he had been drinking alcohol and was sent home by his parents. *Id.* At home, Roger took an unknown quantity of Tylenol, which made him sick the next day at school. Later that day, he went to the Trinity Medical Center in Moline, where it was discovered that he had taken between 80 and 100 Tylenol tablets. *Id.* It was agreed that Roger did not attempt to commit suicide; however, the medical reports consistently stated that Roger overdosed out of anger and frustration. *Id.* Roger's parents filed suit against their insurance provider, Iron Workers' Tri–State Welfare Plan, because it refused to pay for the physicians and hospital treatment. *Id.* The insurance plan stated that no benefits were payable for "intentionally self-inflicted injury." *Id.* The Court found the overdose to be an accident but also found that the denial of benefits was appropriate because Roger inflicted the injury upon himself. The Court formulated a test to determine whether an injury is "intentionally self-inflicted." The Court must consider: (1) Was the ingestion voluntary?; (2) Did the insured know that the ingestion would be likely to cause an injury?; (3) Did the ingestion cause an injury?; and (4) Did the loss result from the injury? *See Bevans*, 971 F.Supp. 357; *see also Santaella*, 123 F.3d at 465 ("Without some evidence that she was aware of the risk of serious injury or death, we must conclude that [the insured] did not die from an intentionally self-in-

flicted injury and thus that the exclusion did not bar her claim."). Accordingly, the Court must determine if there is some evidence that a decedent was aware of the risk of serious injury or death. *Id.* This Court also stated in *Bevans:*

> It is not necessary that the person ingesting the drugs know that death could result. If the person ingesting the drugs has a general cognizance that the drugs could produce some injury, it is enough that there is some causal relation between the injury caused and the ultimate loss.

971 F.Supp. at 362; *citing Holsinger v. New England Mut. Life Ins. Co.,* 765 F.Supp. 1279, 1282 (E.D.Mich.1991). Overall, it is not determinative that the plaintiff did not mean to commit suicide; but rather a reasonable person would have known that taking the drug could cause injury.[1] *Bevans,* 971 F.Supp. at 362.

■ In the instant case, the Court concludes that Faust accidently overdosed according to the standard set forth in *Santaella.* It is reasonable to assume that Faust consumed the drugs with the expectation that he would be alive to experience the "high" from the drugs. Moreover, the parties have stipulated that Faust did not ingest the drugs in an attempt to commit suicide. Also, the record establishes that it would be objectively reasonable for a person in Faust's position to believe that death was not *substantially certain* to occur. Plaintiffs' expert testified that the amount of drugs Faust took is perceived to present a "relatively small hazard" by most users. (Stipulation, Ex. B, Gr. 1, Deposition Transcript of Stephen M. Lasley, Ph.D., "Lasley Dep." 26). Therefore,

Faust's expectation of survival *could* be considered objectively reasonable.

However, unlike the case presented to the court in *Santaella,* there is evidence to support the conclusion that Faust was aware of the possibility of serious injury or death. While the evidence is less than overwhelming, both parties have stipulated that Faust's consumption of the drugs was voluntary and no one disputes the fact that Faust knew what he was taking. Accordingly, this Court must shift its focus to determine if the exclusion clause of the plan prevents recovery of accidental benefits if the decedent "intentionally inflicted self-injury." Under that analysis, the only dispute in the instant case is whether Faust knew the ingestion would be likely to cause an injury. *Bevans,* 971 F.Supp. at 357; *see also Santaella,* 123 F.3d at 465.

It is well documented that "[t]he illegal importation, manufacture, distribution, and possession and *improper use of a controlled substance have a substantial and detrimental effect on the health* and general welfare of the American people." 21 U.S.C. § 801(2) (emphasis added). In the instant case, Faust ingested a combination of cocaine, morphine, and ethanol. This mixture of drugs is among the most harmful and lethal of those drugs available on the street. Heroin, a combination of morphine and ethanol, is classified as a Schedule I Drug under the Controlled Substance Abuse Act. *See* 21 U.S.C. § 812(b)(1). A Schedule I Drug is defined by the following properties:

> (A) The drug or other substance has a high potential for abuse;

---

1. Plaintiffs contend that this reading of *Bevans* would allow an insurance company to deny benefits to individuals who suffered injuries as the result of participating in dangerous activities such as scuba diving and skiing.

Although the Plaintiffs are correct that participation in these recreational activities involve a certain degree of risk of harm, they are clearly distinguishable from the ingestation of an illegal drug.

(B) The drug or other substance has no currently accepted medical use in treatment in the United States; and

(C) There is a lack of accepted safety for use of the drug or other substance under medical supervision.

21 U.S.C. § 812(b)(1).

Plaintiffs' own expert witness, Dr. Lasley, Ph.D., confirms the detrimental effect of the combination of the opiate, heroin, and cocaine, explaining that the side effects are "a little more intense than either one of the drugs alone would be," which "probably makes them more hazardous." (Stipulation, Ex. B, Gr. Ex. 1, Lasley Dep., p. 12). Plaintiffs' expert also testified that the ingestion of a "speedball" that is, cocaine and heroin together can cause death, because cocaine alone can cause cardiovascular stress, stroke, seizures, and coma, but with the addition of heroin, the odds for a deadly result increase. (*Id.* at 14–25). Moreover, Plaintiffs' expert gave the following testimony:

Q: So a reasonable person in Mr. Faust's position who took the drugs that were taken in this case should have known that taking them, that cocaine, heroin and alcohol together could cause some ... form of injury, correct?

A: I would think that he would be aware that there was some possibility of that.

(*Id.* at 26, 27.)

No one disputes that Faust took the "speedball" for pleasurable effects. However, with the widespread dissemination of drug information and the high general public perception of the danger of using drugs such as heroin and cocaine, Plaintiffs cannot reasonably assert that Faust did not know that his ingestion of heroin, cocaine, and ethanol could cause serious injury and possible death. Faust had to be aware of the risk involved and assumed that risk. Unfortunately and tragically, this was a risk he was willing to take ---- and he paid with his life.

The Court is sympathetic to the loss Brian Faust's family feels. Despite valiant efforts on the part of many parents, teachers, community leaders, and government officials to discourage the use of illegal drugs, too many individuals, such as Brian Faust, fall victim to this insidious plague. Brian Faust's voluntary participation in such dangerous action leaves no doubt that the resulting injuries are "intentionally self-inflicted." Therefore, the exclusion applies. There is no recovery under the policy.

### *Conclusion*

For the reason stated herein, Defendant's Motion of Summary Judgment is GRANTED, and Plaintiffs' Motion for Summary Judgment is DENIED. This case is terminated.